**UNITED STATES DISTRICT COURT**

**DISTRICT OF IDAHO**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) CASE NO. 4:20-cr-00188-BLW |
| | ) |
| Plaintiff, | ) **JURY TRIAL DAY 4** |
| | ) |
| vs. | ) **TESTIMONY OF TEL JAMES BOAM** |
| | ) |
| TEL JAMES BOAM, | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

**PARTIAL TRANSCRIPT OF PROCEEDINGS**
**BEFORE THE HONORABLE B. LYNN WINMILL**
**FRIDAY, SEPTEMBER 10, 2021**
**POCATELLO, IDAHO**

**FOR PLAINTIFF**
        Justin K. Paskett
        John C. Shirts
        U.S. ATTORNEY'S OFFICE FOR THE DISTRICT OF IDAHO
        801 E. Sherman Avenue, Suite 192
        Pocatello, ID 83201

**FOR DEFENDANT**
        Robin D. Dunn
        DUNN LAW OFFICES, PLLC
        PO Box 277
        Rigby, ID 83442

        Manuel T. Murdoch
        MURDOCH LAW OFFICE PLLC
        PO Box 822
        Blackfoot, ID 83221

Proceedings recorded by mechanical stenography, transcript
produced by computer.
_____

**TAMARA I. HOHENLEITNER, CSR 619, CRR**
FEDERAL OFFICIAL COURT REPORTER
550 WEST FORT STREET, BOISE, IDAHO  83724

EXHIBIT A

I N D E X

SEPTEMBER 10, 2021

**D E F E N S E   W I T N E S S**

**PAGE**

**TEL JAMES BOAM**
    Direct Examination By Mr. Dunn..........................3
    Cross-Examination By Mr. Paskett.......................48
    Redirect Examination By Mr. Dunn......................75
    Recross-Examination By Mr. Paskett....................77

```
 1                        P R O C E E D I N G S

 2                        September 10, 2021

 3            (Partial transcript.)

 4                 TEL JAMES BOAM, DEFENDANT'S WITNESS, SWORN

 5            THE CLERK:  Go ahead and please be seated.

 6            You're able to remove your mask now.

 7            THE WITNESS:  Thank you.

 8            THE CLERK:  You're welcome.

 9            Please state your complete name and spell your name

10       for the record.

11            THE WITNESS:  Tel James Boam.  T-E-L, J-A-M-E-S,

12       B-O-A-M.

13            THE COURT:  You may inquire.

14            MR. DUNN:  Thank you, Your Honor.

15                        DIRECT EXAMINATION

16       BY MR. DUNN:

17       Q.   T.J., I want to begin at the beginning.

18            When did you meet Melinda Scott?

19       A.   Late summer of 2010.

20       Q.   And where did you meet her?

21       A.   On the golf course regarding a Golden West Irrigation golf

22       tournament.

23       Q.   And I take it you spoke with her at that time?

24       A.   I did.

25       Q.   And eventually you started dating; is that correct?
```

1      A.    That's correct.

2      Q.    And tell the jury approximately how long you dated.

3      A.    We dated from about then to February of 2012, is when we

4      got married.

5      Q.    And where did you get married?

6      A.    We got married at The Loft in Rigby.

7      Q.    And is that a reception center?

8      A.    That is.

9      Q.    Did you recognize and realize that she had two daughters

10     coming into this marriage?

11     A.    Yes, I did.

12     Q.    And had you met them on your -- in your dating process?

13     A.    Yes, I did.

14     Q.    And did you know that you would be taking on some

15     responsibility in regards to both your spouse and these two

16     children?

17     A.    Because I had no kids of my own, yeah, I knew that was a

18     big responsibility.

19     Q.    You began your marriage living at what location?

20     A.    I already had a house on 129 North, which would be Coltman

21     Road in Coltman, Idaho.

22     Q.    Would that be Bonneville County?

23     A.    That's correct.

24     Q.    Did you and your new bride and two -- her two children move

25     into that house?

1    A.   Yes, we did.

2    Q.   Approximately how long did you live at that house?

3    A.   Until 2014.

4    Q.   And then what happened?

5    A.   And then I was approached by a longtime family friend, and

6    they were going to build a new house, and they wanted to know if

7    I was interested in buying their house; and of course, I was.

8    Q.   Did you discuss that matter with Melinda Scott?

9    A.   Yes, I did.  I took her through the house and everything

10   and asked her if that was -- if that was something she was

11   interested in doing.

12   Q.   And what was her response?

13   A.   She liked it very, very much.

14   Q.   Describe this house as you first entered it in 2014.

15   A.   It's an old farmhouse, but it's been added on.  It was

16   built in 1905, but it's been added on five or six different

17   times throughout the course of a couple different families.

18   Q.   So the structure of this house would be somewhat unique to

19   houses in general?

20   A.   Correct.

21   Q.   And was Ms. Scott employed?

22   A.   At the time we moved into the new house, no.

23   Q.   Now, what was your employment at that time?

24   A.   A wide variety of things.  I worked on a family farm for my

25   father.  I ran some of my own farming ground.  I did a lot of

1    custom farming for other people and did just about anything else

2    I could to help pay bills.  I just kept myself really, really

3    busy.

4    Q.   Did you love your family?

5    A.   Absolutely.

6    Q.   And what happened as time went along?

7    A.   As time went on, we -- we started trying to separate the

8    business away from my father's side of things and started doing

9    our own thing a little deeper.  And then that got freed up a

10   little bit, which freed up a little more time.  And I started a

11   cattle herd of my own of purebred Black Angus cattle and sold

12   seed stock, bred heifers and bulls, things like that.

13   Q.   Did you eventually have some little ones of your own?

14   A.   Yes, we did.

15   Q.   And what are the names of those two little girls?

16   A.   ███████████████     is my oldest; she is 8.  ████████████

17   ███, she is my youngest; she is 5.

18   Q.   Do you love them with all your heart?

19   A.   I love them with every fiber of my being.

20   Q.   Now, as time progressed, did Melinda Scott develop a

21   business located in the home?

22   A.   Yeah.  We -- we discussed that.  And where there was her

23   kids at home and us starting a new family, we were trying to do

24   something that would free up enough time for her to be a mother

25   to the children.  And we come up a plan together of an in-home

1    day care, which would allow her to spend as much time as

2    physically possible with her own kids as well as generating a

3    small amount of income.

4    Q.   And when you, as a team, started this business in addition

5    to your work, were your little ones -- of what age?

6    A.   They were -- they were young.  When she started the day

7    care, we didn't have ███████ yet.

8    Q.   So you had your older child and the two ███████ girls;

9    correct?

10   A.   That's correct.

11   Q.   Did things go fairly smoothly between you and Melinda

12   during that time period?

13   A.   Yes, very smoothly.

14   Q.   And I take it, from year to year, you would get operating

15   loans; is that correct?

16   A.   Yeah.  There was --

17              MR. PASKETT:  Objection.  Relevance.

18              THE COURT:  I'm going to give some leeway, but counsel

19   knows my ruling on those issues.  So proceed.

20              THE WITNESS:  There was -- in farming and agriculture

21   and things, there is a massive amount of debt that needs to be

22   covered all the time.  You can't -- you can't just out-of-pocket

23   those kind of things.  It's a cash flow issue.  To get from

24   point A to point B, you need additional funding.

25   Q.   BY MR. DUNN:  And so the day care was to help in addition

1      to your other employment responsibilities?

2      A.   The main focus of the day care was to allow Melinda to be a

3      mother to the children.

4      Q.   And eventually, the next little child came along; correct?

5      Is that a yes?

6      A.   Yes.

7      Q.   Could you tell the jury how this blended family was doing

8      at that point in time.

9      A.   This blended family was doing very well.  We were getting

10     on top of things and progressing quite well.  We were picking up

11     more ground to run.  My custom business was expanding.  The kids

12     got along with each other as a blended family.  It was nice.

13     Q.   In general, were you very happy?

14     A.   Yes.

15     Q.   Did you believe Ms. Scott was very happy?

16     A.   Yes, I did.

17     Q.   Would it be normal for the two of you to express tokens of

18     love via text and other messaging?

19     A.   All the time.

20     Q.   And did your farming and custom farming operations often

21     require late hours of work?

22     A.   Absolutely.  There was -- there was a lot of long nights.

23     Q.   And then you obviously began calving?

24     A.   Yep.

25     Q.   Tell the jury why that is time-consuming.

1    A.   Well, farming is time-consuming in and of itself, and then

2    you add mother cows to it and having the babies and things like

3    that; then that just kind of eliminates every ounce of free time

4    that you ever had.

5    Q.   Did you eventually take on extra help to assist you in your

6    farming endeavors?

7    A.   I had another family that worked for me the entire time,

8    even before I met Melinda.

9    Q.   And who was that, the family?

10   A.   Laurel Avila (phonetic) and his wife and kids.

11   Q.   And so the two of you did whatever was necessary to

12   complete farming and ranching opportunities?

13   A.   Yep.  Yes.

14   Q.   And was that acceptable to Melinda Scott?

15   A.   Yes.

16   Q.   And what happened over the next few years?

17   A.   The next few years, I just got scattered farther and

18   farther out with the custom work.  I obtained a fertilizer

19   spreader and was spreading out of town for weeks at a time.  So

20   I was spending less and less time at home.

21   Q.   And did that cause some issues with your family?

22   A.   That did.

23   Q.   And could you tell the jury how.

24   A.   Well, just a term my wife would refer to it as she was

25   single married.  She basically led the single life but was

1    married.

2    Q.   And what did you do to try to compensate?

3    A.   Every -- every free time I had, that's where I was, was

4    with my family.

5    Q.   And could you go on from what happens next in time

6    regarding the day care.

7    A.   She -- her day care started expanding as well as the

8    farming business did, too.  You run a good business, and it gets

9    bigger and bigger, too.  And she ended up hiring some more

10   employees, things like that and taking on new clients.  And so

11   her schedule got to be just as busy or busier than my own.

12   Q.   Would it be fair to say that you were up early and to bed

13   late, both of you?

14   A.   Yes.

15   Q.   And the little girls all started to grow up; correct?

16   A.   Correct.

17   Q.   And how did you try to provide for them and be a father?

18   A.   Any -- any physical way that I could.  Any activities that

19   they wanted to go do that we could fit into our schedule, we

20   would go do.  If there was ever a time that we could incorporate

21   the family into the farming activity that we were doing at the

22   time, we would do that, too.

23   Q.   And you heard that Ms. ████████ was pretty handy about

24   farm work; is that correct?

25   A.   Absolutely.

1    Q.   And could you tell the jury what farm work she did and how

2    it helped the two of you bond.

3    A.   She was a very ambitious young girl.  She wanted to be

4    outside all the time.  She got to the point where she didn't

5    want to hang around the little babies all the time, so she

6    wanted to come out and do some work.

7              So I taught her.  I taught her how to run equipment.

8    I taught her how to mark the dikes, taught her how to change the

9    water.  And she did all that really well.

10   Q.   Did you love her?

11   A.   Absolutely.  It's my family.

12   Q.   And did you try to treat all of the children equally?

13   A.   Absolutely.

14   Q.   How would you describe yourself as a parent?

15   A.   Very loving, very caring and compassionate.

16   Q.   Who made most of the rules in the house?

17   A.   That would be Melinda.

18   Q.   And why was that?

19   A.   It's her house.  She run a day care in the house.  She

20   needed to have everything in its place, and it needed to be run

21   her way to make things work for her business.

22   Q.   And eventually, it grew to a fairly large day care

23   facility; correct?

24   A.   She did very well.

25   Q.   Now, in this house, you've heard testimony that there are

1       three showers; is that correct?

2       A.    That is correct.

3       Q.    And are all those showers functional?

4       A.    Yes.

5       Q.    And your master bedroom and master bath seemed a little bit

6       unusual to me when I first had you talk to me about that.

7       A.    Mm-hmm.

8       Q.    Could you describe to the jury why that's unusual.

9       A.    Just simply because the house was added on so many times.

10      It's just -- that's kind of where the layout fell.  It was

11      awkward to get to because it was only accessed through the

12      master bedroom.

13      Q.    And what I found unusual is, to get to the master bathroom,

14      you had to go through the closet; is that correct?

15      A.    Yes.

16      Q.    And did it -- was there a door on the closet?

17      A.    Yeah.  There was a pocket door on both sides of the closet.

18      Q.    What's a pocket door?

19      A.    A pocket door is a slide door that just slides into the

20      wall and hides like it's in a pocket.

21      Q.    Okay.  And then is there a second door that allows you into

22      the bathroom?

23      A.    Yes.  Same style.

24      Q.    And it's a fairly small bathroom; correct?

25      A.    Correct.

1    Q.   But it had a shower and tub and toilet and things -- a

2    vanity, et cetera?

3    A.   Correct.

4    Q.   Now, when you came from the house in Bonneville County to

5    the house that you lived in, was there a shower curtain that was

6    brought?

7    A.   From the old house?

8    Q.   Uh-huh.

9    A.   No.

10   Q.   A clear shower curtain, where did that come from?

11   A.   Into the new house from the old house?

12   Q.   Correct.

13   A.   No.

14   Q.   When did you get the new shower curtain, what they call the

15   clear plastic shower curtain?

16   A.   You're referring to the one that was purchased on the

17   Amazon account?

18   Q.   That's correct.

19   A.   That was purchased for the old home when we were moving out

20   of it.  The old shower curtain was grody and ugly and had to

21   replace it for the new people moving in.

22   Q.   And how did that clear shower curtain end up in the new

23   facility?

24   A.   That -- that clear shower curtain never did.

25   Q.   Okay.  So then what happened as far as the shower curtain

1     goes?

2     A.    As far as the shower curtain goes, that's Melinda's

3     department.  It's her house.  She is the decorator; I'm the

4     farmer.  I'm not the home decorator.

5     Q.    So there was a shower curtain eventually purchased for the

6     new house?

7     A.    Correct.

8     Q.    You didn't purchase it?

9     A.    No.

10    Q.    The girls are starting to grow a little more each and every

11    day of your marriage; correct?

12    A.    Yes.  Fast.

13    Q.    Then what happens?

14    A.    Being gone all the time started taking its toll on Melinda

15    and I as a couple.  It would wear on our marriage.  We weren't

16    spending enough time together -- enough quality time together.

17    Q.    And as a result, what did the two of you do?

18    A.    There was a point that Melinda asked for a separation, and

19    I -- I said to her -- I said, "If you want a separation, we

20    might as well just get divorced because that's where it's

21    headed, isn't it?"

22            And she says, "Well, not necessarily."

23            I said, "Well, would you be interested in doing

24    marriage counseling?"

25            And she said, "I was hoping you would ask that."

1     Q.   Then what happened?

2     A.   So then we -- we set up -- she was already doing some

3     individual counseling.  So with that agency, she asked if there

4     was a marriage counselor there available; and there was, and so

5     we started some marriage counseling.

6     Q.   And how long did that last?

7     A.   That lasted through the summer of 2018, into harvest.

8     Q.   And did you both attend at the beginning?

9     A.   Yes.

10    Q.   What ultimately came about as a result of this marital

11    counseling?

12    A.   The marital counseling ended after there was a divorce

13    filed.

14    Q.   So up to that point, did you both attend?

15    A.   Yes.

16    Q.   And after the divorce was filed, did -- who filed?

17    A.   Melinda.

18    Q.   After that, did you continue to attend counseling with a

19    different person?

20    A.   I did.

21    Q.   And why did you do that?

22    A.   Because I could see myself with her and our family the rest

23    of my life, and it was a hard pill to swallow.  So I needed

24    someone to talk through that with.

25    Q.   And when the divorce was filed, was that your desire?

1    A.    No.

2    Q.    Did you still love Melinda and the children?

3    A.    Yes.

4    Q.    Did you ever discuss adopting Ms. ███████?

5    A.    Yes, I did.

6    Q.    And did you and Melinda -- when did you consider that?

7    A.    A couple of different times throughout the years there

8    towards the -- towards the end of the marriage.

9         She was having trouble with her father -- with her

10   biological father.  And she just -- she didn't want to spend the

11   time with him.  I tried to assist in that because I just -- I

12   feel like she needed to spend time with her father, and it

13   just -- it never went anywhere.

14        So that topic got brought up more and more.  And

15   since -- since he was so -- since Travis, her biological father,

16   was so unwilling to go along with an adoption of that sort, she

17   was close enough to 18, we just decided that wasn't really an

18   option.

19   Q.    Let's go back to the day care.

20        Was there a camera initially installed in the day

21   care?

22   A.    Yes.

23   Q.    And I think I understand the purpose, but what was the

24   purpose?

25   A.    Melinda had a lot of employees and a lot of -- a lot of

1      things out of place all the time.  She liked to keep everything

2      in place.  And that assisted her in that.

3      Q.   And how was that initial camera used in the sense of

4      connected to what device?

5      A.   I believe that app was on both her phone and my phone at

6      the time.

7      Q.   The initial camera?

8      A.   Yeah, the initial camera.

9      Q.   And did that allow for viewing of the children?

10     A.   Yes.

11     Q.   And at that point, you had more employees, I take it?

12     A.   Correct.

13     Q.   Did there come a point in time that this initial camera was

14     either outdated or nonfunctional?

15     A.   I don't recall it being nonfunctional, but there was an

16     upgrade needed, is what I understood.

17     Q.   Who told you that there was an upgrade needed?

18     A.   Melinda.

19     Q.   And so what happened next?

20     A.   She sent me a text one day asking if we could get a new

21     camera for the day care.  And then she was talking about things

22     being out of place and bite marks and certain things that that

23     current camera wasn't catching.

24     Q.   The old one?

25     A.   Correct.

```
 1              And so instead of trying to text all that out, we

 2      talked about it over the phone and then talked about it when I

 3      got home.  A couple days later, we ordered -- we ordered two

 4      cameras and a sleeping bag.

 5      Q.   Now, you say you ordered two cameras.

 6              Was she present when you made the order of two

 7      cameras?

 8      A.   Yeah.  She helped me pick them out.

 9      Q.   Both of them?

10      A.   Yes.

11      Q.   And what was the purpose of the second camera that I'll

12      refer to as the "bathroom camera"?

13      A.   I had a broken leg at one point and had some prescription

14      drugs that we kept in the medicine cabinet.  She had the same

15      kind of prescription drugs.  And we ended up missing an entire

16      bottle of those prescription drugs.

17              And she brought that to my attention, and that was

18      kind of the basis for this other camera as well as things being

19      out of place in the day care.

20      Q.   Now, did the order get placed?

21      A.   Yes.

22      Q.   And do you recall the approximate time or date of that

23      order?

24      A.   From the documents I have reviewed, it's either May 24th or

25      -5th.
```

1       Q.   Of what year?

2       A.   2018.

3       Q.   So did you install the camera in the day care?

4       A.   No.  I left that up to her.

5       Q.   And did she install it?

6       A.   I believe so, because a couple days later I seen it was up.

7       Q.   And she had the wherewithal, the knowledge to do that; is

8       that correct?

9       A.   Yes.

10      Q.   Now, what happened to the bathroom camera?

11      A.   What do you mean, what happened to it?

12      Q.   What did you do when you received it?

13      A.   Melinda was the one that received it.  She opened the box

14      and set it on the end of the table.  When I got home, she just

15      said, "Hey, the cameras came."  And then we talked about it,

16      opened the box, and ate dinner, things like that.

17      Q.   Did you try to make the bathroom camera functional at that

18      time?

19      A.   I think it was a couple of days after that.  It was a late

20      night that night when I got home.

21      Q.   So when you tried to make it functional, were you in the

22      living room testing it out?

23      A.   Correct.

24      Q.   And tell the jury what you did.

25      A.   Well, we just opened the box.  We were sitting there as a

1    family, just playing around with the electronics, watching a

2    movie, just things you do as a family when you are all sitting

3    there together.

4            And we plug it into the wall and try it out, and I

5    couldn't get it to work.  So Melinda tries to help me to get it

6    to work.  We get it to work, and then we go to place it in the

7    bathroom and then we walk away from it, and the screen drops

8    out.

9    Q.   When you say "the screen drops out," what do you mean?

10   A.   Meaning you could only view it from a certain distance.

11   Q.   Okay.  And how many outlets are in this master bathroom?

12   A.   There is only one.

13   Q.   So --

14   A.   Only one set of outlets.  There is two plug-ins on the

15   outlet.

16   Q.   So that's the only place that it could be placed in the

17   master bathroom?

18   A.   Correct.

19   Q.   And was it placed so it could be -- view the medicine

20   cabinet?

21   A.   Yes.

22   Q.   And who plugged it in, if you recall?

23   A.   Melinda and I both plugged it in.  She had the phone and

24   had -- had, I believe, my phone in her hand.  We plugged it in,

25   and we were walking back to the living room.  And it just

1    wouldn't work past the end of the hallway into the living room.

2    Q.    And how did you install the BVCAM on your phone?

3    A.    I don't recall if that was her or me that put that on

4    there, but that's part of the technical problem I was having

5    trouble with.

6    Q.    Now, what camera at that point in time, in 2018, did you

7    have?

8    A.    Say that one more time.

9    Q.    What camera brand and model did you have at that point?

10   A.    Camera or phone?

11   Q.    Did I say "camera" again?  I'm sorry.  I keep doing that.

12            Phone.  Excuse me.

13   A.    I believe it was an iPhone 6.

14   Q.    And do you remember the color of it?

15   A.    Either white or silver, something like that.  I always had

16   a case on it, so I -- I don't recall that.

17   Q.    Now, this camera -- not camera -- this phone -- excuse

18   me -- the iPhone 6, was it supposed to be for you?

19   A.    The iPhone 6?

20   Q.    Mm-hmm.

21   A.    Yes.

22   Q.    Now, previous to the iPhone 6, had you purchased other

23   cameras as they developed and got better?

24   A.    Other phones?

25   Q.    iPhones.

1    A.   Yes.

2    Q.   You had started with a lower grade of iPhone; and over the

3    years, you just kept --

4    A.   I believe I started clear back when they had iPhone 3.

5    Q.   And you just kept upgrading?

6    A.   Yeah.  I farm and ranch, so it gets -- it gets broken or

7    beat up and doesn't function properly, and so I upgrade.

8    Q.   Okay.  Now, what happened to this iPhone 6?

9    A.   Midsummer, it -- I was changing water, and I bent down to

10   pull out a headgate out of the culvert.  I had it in the top

11   pocket in my shirt, and it fell out into the ditch.

12            I jumped in to get it out.  I get it out, throw it on

13   the bank, and I get out and finish pulling the tin out.  Go back

14   home, I put it in a bag of rice, hope for the best because it's

15   got all my business contacts and everything in it.

16            I had it -- I tried to have it repaired, and that

17   seemed to work for a few months.

18   Q.   Then what happened with that phone?

19   A.   With that phone?  Then Christmas comes and goes, and that

20   phone is just giving me fits, giving me fits.  Melinda and I are

21   talking in the living room, and she goes, "Why don't you just

22   get a new phone.  Why don't you just get a new phone."  I

23   already bought ███ one; I already bought Melinda one.  So

24   money was kind of tight.

25            And so around -- around the end of January, she just

 1    says, "I'm going to go get you a new phone."

 2    Q.   And did she go purchase the new phone?

 3    A.   She went and got me a new iPhone XR from Best Buy.

 4    Q.   Where is Best Buy?

 5    A.   In Idaho Falls.

 6    Q.   And did she bring that phone back to you?

 7    A.   She did.

 8    Q.   And was it fully loaded with applications?

 9    A.   Yes, it was.

10    Q.   What happened to the iPhone 6?

11    A.   It -- it still functions off and on.  When you plug it in

12    for a long period of time, it seems to overheat and then shut

13    down and not work for an hour, a day.  It varied on that phone.

14    And so it ended up just kind of going with all the other old

15    phones.

16    Q.   Did the family ever use the old iPhone 6?

17    A.   We started playing a game called Game of Thrones.  And

18    without getting into a whole bunch of details of that game, you

19    can make alt accounts and use that to help benefit yourself in

20    the game.

21         And we all played that game as a family.  And that

22    phone was used, along with a few others in the house of

23    Melinda's as well, for that purpose.

24    Q.   So this iPhone 6, everyone in the family that was capable

25    could use it?

1      A.    Yeah.

2      Q.    And it wasn't password-protected, or was the password given

3      out?

4      A.    We -- we typically, Melinda and I, ████████ anybody that had

5      a phone we had a passcode on it, even if it was just a simple

6      passcode to keep our little kids from when they are grabbing the

7      phone, they don't just have access to it and call 911 and things

8      like that.  So we had a code for that problem.

9      Q.    Now, when you got the XR phone, that was in January of '19?

10     A.    Correct.

11     Q.    And so any images that could have been taken by the camera

12     in the master bathroom would have had to have been on the

13     iPhone 6; correct?

14     A.    Correct.

15     Q.    And that was readily available to anyone in the family to

16     use?

17     A.    Yes.

18     Q.    Now, you get the iPhone XR.

19           Did Melinda have access to the passcode?

20     A.    Always.  Her and I had no secrets between each other, I

21     thought.

22     Q.    I have in front of me Exhibit 2008, and I'm showing that to

23     defense counsel -- plaintiff's counsel.

24           So, in any event, there was a passcode book that you

25     physically had; is that correct -- in the house?

 1    A.   We kept it in the safe, yeah, in the house.

 2    Q.   And you and Melinda both had access to the passcode book;

 3    is that correct?

 4    A.   Yes.

 5    Q.   And did it have passcodes for many different items?

 6    A.   Correct.

 7    Q.   And what were those items?

 8    A.   Any -- any kind of password you ever needed to remember so

 9    you didn't -- if you lose your password, forget your password,

10    we could refer back to it.

11         We kept serial numbers of guns and things like that in

12    it, as well, passwords to the alt accounts in that game, things

13    like that.

14    Q.   And you're talking about King of Thrones?

15    A.   Game of Thrones.  Yeah, sorry.

16    Q.   So you could use the XR to play that game also; correct?

17    A.   Yes.

18    Q.   And you've seen the state's exhibits where they've got

19    before the jury the two phones, the 6 and the XR; correct?

20    A.   Correct.

21    Q.   Now, there came a point in time that you and Melinda had a

22    discussion over this phone that was in the bathroom; is that

23    correct?

24    A.   Over the camera?

25    Q.   Camera.  Did I say "phone"?  Excuse me.  Over the camera.

```
 1              Is that correct -- and/or the phone?

 2    A.   Are you referring to when she confronted me?

 3    Q.   Yes.

 4    A.   We -- she wasn't discussing the camera at the time.

 5              You just want my recollections of that event?

 6    Q.   Yes.

 7    A.   Sometime early, early in the morning, she -- I was sleeping

 8    on the couch, and I was awoken to her.  She came in the living

 9    room, and she tried to sit down on the ottoman that was sitting

10    right next to the couch; and she missed and went clear to the

11    floor.

12              And it woke me up.  I'm like, "Honey, are you okay?"

13              She's -- "Yeah, yeah.  I'm fine."  And then she -- she

14    proceeds to ask me, "Are you involved with my daughter?"

15              And I says, "No, Mindy.  What are you talking about?"

16              And she says, "Well, I found videos on the phone."

17              And I said, "Are you okay?  Is something going on

18    right now?"

19              And she says, "Are you cheating on me?"

20              I says, "No, Melinda, I'm not."

21              And some further discussion went on, and we eventually

22    decided to go to bed and deal with it when we were fresh in the

23    morning, because we were both kind of out of sorts from being

24    woke up and distraught and things like that.

25    Q.   Do you remember the day?
```

1    A.    I believe it was September 21st.

2    Q.    Of what year?

3    A.    2019.

4    Q.    Okay.  And this is a phone that you've had since January of

5    2019?

6    A.    Correct.

7    Q.    You didn't have it in 2018?

8    A.    Say that again.

9    Q.    You did not have the XR in 2018?

10   A.    Not in 2018, no.

11   Q.    Tell the jury what happened next.

12   A.    So we went to bed.  And I got up that morning, got in the

13   shower, washed the sleep out of my eyes.  I got out of the

14   shower, and she is sitting up on the bed.  She goes, "What do

15   you want to do about this?"

16         And I says, "You're going to have to show me what

17   you're talking about, because I don't know what you're talking

18   about, honey."

19         And she grabs my phone, which was sitting on her

20   nightstand at the time, and opens this -- opens this app.  And

21   there is all these thumbnails of this stuff that the camera had

22   taken video of.

23         And I says, "Well, what do you want to do about it,

24   Melinda?"

25         And she says, "Just delete it."

1               And I said, "Do we need to talk to ███████ about it?"

2               And she goes, "No.  Once it's gone, we don't need to

3       deal with it anymore."

4       Q.   So what happened?

5       A.   So then we deleted it.

6       Q.   And that would be the app or --

7       A.   Yep.  We just deleted the app.

8       Q.   So the app was no longer on there?

9       A.   Correct.

10      Q.   Now, the camera that was also a charger, that was gone in

11      December of 2018; correct?

12      A.   Correct.  I asked her -- I asked her at the time -- I said,

13      "So where is the camera?"

14              And she says, "I'm pretty sure I threw it away a long

15      time ago."

16      Q.   And did you ever question why the camera was gone?

17      A.   No.

18      Q.   Did you even care?

19      A.   No.  It wouldn't function as what we wanted it to anyway,

20      like the one in the day care would do.  So it was just used as a

21      USB charger, secondary function.

22      Q.   Now I'm going to ask you some more difficult questions.

23      A.   Okay.

24      Q.   And you look the jury in the eyes and you tell them.

25              Did you ever knowingly film ████████████?

1    A.   No, I did not.

2    Q.   Did you ever open this app that was on the XR?

3    A.   No, I did not.

4    Q.   When was the first time that you learned that there was

5    something on the XR?

6    A.   When Melinda brought it to my attention.

7    Q.   And you've explained what you did; correct?

8    A.   Correct.

9    Q.   Did you knowingly ever open the iPhone 6 and look at this

10   app?

11   A.   We checked the iPhone 6, and that app was not on that

12   iPhone 6 at the time.

13   Q.   Then what happened?

14   A.   Then we went about our daily activities that day.  And the

15   next day, I believe we all went to breakfast.  Sunday morning,

16   we went to breakfast.  I needed a haircut before I went to

17   Mackay.  I went to Mackay that week and cut grain all week.

18   Q.   Then what happened?

19   A.   There were some things that needed taken care of at home

20   with the cattle throughout the week, and I was kind of depending

21   on Mindy and ███████ to help with that.

22        And Friday, they went and did that for me.  But they

23   did it not quite as I instructed, which they fed a fresh bale of

24   third-crop hay out there to the cattle, which was a disaster

25   seeing to have happen.  Because if cattle eat fresh third-crop

1    hay, they will bloat and die.

2    Q.   So what happened next?

3    A.   I got a phone call from my father asking why Melinda was

4    using the loader and taking a bale out of his stack at the shop.

5    And that's when I knew that she got the wrong hay.

6         And so I tried calling her, and she didn't want to

7    answer her phone.  Her and my sister and Cody and Cally were all

8    hanging out together.  And I'm out cutting grain out to Mackay,

9    just going:  Great.  What do I do?  You know.

10        I had nobody that could go push the cattle out of

11   the -- out of that feed for the night and make sure they

12   didn't -- so they didn't eat it all and bloat.

13        So I shut the -- shut the combine off early and headed

14   for home.

15   Q.   And you arrived at home, I take it.

16   A.   I headed -- I headed straight to -- I didn't go home.  I

17   headed straight for the -- straight for the corrals and got the

18   cattle pushed into a different section and just shut the gates

19   so that they couldn't access that section and eat the hay.

20        And still trying to call Melinda the whole time, no

21   answer.  She had her phone turned off, it seemed like.  So I

22   called my mother, and she says, "Yeah, the kids are here."

23        And I said, "Well, I'll be over in a little bit."  And

24   I just headed to my mother's house.

25   Q.   And do you recall what day that was?

 1   A.   That was a Friday after the 21st.  So that next Friday.

 2   Q.   Of September?

 3   A.   Yeah.

 4   Q.   Okay.  And then what happened?

 5   A.   I went and knocked on the door, and she wouldn't answer the

 6   door.

 7   Q.   Who is "she"?

 8   A.   My mother.

 9   Q.   Okay.

10   A.   I waited there a little while longer and still couldn't get

11   ahold of Mindy, still couldn't get ahold of Mindy.  And pretty

12   quick, my sister came walking around the corner on the sidewalk.

13   Q.   And who would that be?

14   A.   Cally Boam.

15   Q.   Okay.

16   A.   She -- she obviously had been drinking.  You could smell it

17   on her breath pretty heavy, and her actions were very violent.

18            MR. PASKETT:  Object to the relevance of this

19   testimony.

20            THE COURT:  Sustained.

21   Q.   BY MR. DUNN:  Then what happened?

22   A.   I waited there a little longer, tried to get my mother to

23   answer the phone.  Nobody wanted to answer the phone.  So I

24   called the Bonneville County Sheriff's Department.

25            I asked them if there was anything that could be done

 1    because I can't get ahold of my wife and get access to my kids.

 2    I don't know what's going on.

 3          And he says, "Well, this is a civil matter.  We could

 4    come out and help, but we would rather not because it's a Friday

 5    night, and we've got bar scenes and things like that we need to

 6    take care of."

 7          And I said, "I understand."

 8          At that point, I headed for home.

 9    Q.   When you arrived home, what did you find?

10    A.   Nobody home.

11    Q.   So what did you do?

12    A.   Just -- I went to bed.  I texted her another text, and I

13    went to bed.

14    Q.   And that was with the XR?

15    A.   Correct.

16    Q.   So then what did you do?

17    A.   The next morning -- the next morning -- I don't recall if

18    it was her that contacted me or me that contacted her -- but she

19    said she needed to take a break, but she would call me later,

20    later that night and let me talk to the kids, which she did.

21    Q.   So what did you do during this time?

22    A.   I was home.  So I had cattle and fall work to do, things

23    like that.  I just did my work, same as normal.

24    Q.   Then what happened?

25    A.   We -- she called and we talked to the kids.  She didn't

1    really want to talk on the phone, but I talked to the kids a

2    little bit and made conversation with the kids.  They --

3    somebody hung up the phone, and that was that.  Couldn't get

4    back ahold of them, nothing like that.

5    Q.    So what date are we at now?

6    A.    That was Saturday.

7    Q.    Okay.  Then what happened?

8    A.    The next day, is that what you're asking?  What happened

9    the next day?

10   Q.    That's correct.

11   A.    The next day -- it's fall, so our cattle are all kind of

12   running out of feed.  We start gathering up cattle to wean

13   calves.

14         And by "we," I mean my father's cattle, my cattle.

15   And they are all in different locations, so it just takes all

16   day to do that kind of stuff.  Did that Monday as well.

17         And Tuesday, we had them in the corrals -- by Monday

18   night, we had them in the corrals.  And early Tuesday morning,

19   they broke out of the corrals because they were looking for

20   their mamas after being weaned, and they were scattered within

21   four square miles.

22   Q.    So what did you do?

23   A.    I called the Jefferson County Sheriff's Department for some

24   assistance to come -- because, see, we are right on the

25   Lewisville Highway, which is a very busy road.  And I asked them

1    to just kind of come monitor the traffic as we were pushing

2    cattle across the road.  We were on our four-wheelers trying to

3    gather up calves all over.

4            And Detective Melanese -- or not Detective Melanese.

5    Corporal Melanese showed up.

6    Q.   And how did that go?

7    A.   It was good.  She -- she was there.  She understood why we

8    needed the help.

9            MR. PASKETT:  I'm going to object to the relevance of

10   this.

11           THE COURT:  Counsel, I don't see the relevance.  If

12   you would tie it in rather quickly, I'll allow it; otherwise,

13   let's move on.

14           MR. DUNN:  I'm leading up to --

15           THE COURT:  Well, I know.  Let's --

16           MR. DUNN:  I will -- I understand, Your Honor.

17   Q.   BY MR. DUNN:  So then what happened?  You get them out

18   there, get the cattle put up.  Then what happens to you?

19   A.   I was -- I was distraught.  I haven't got to see my kids

20   all week from being out in Mackay cutting grain.  Mindy didn't

21   want to talk to me.

22           So I asked -- I asked Corporal Melanese basically the

23   same question I asked Bonneville County Sheriff's Department,

24   was:  What do I do in a situation like this?

25           MR. PASKETT:  Objection.  Hearsay.

```
1                    THE COURT:  Sustained.

2        Q.   BY MR. DUNN:  So move on, please.  Go ahead.

3        A.   Don't answer the question?

4        Q.   No, don't answer that question.  Move on.

5                    THE COURT:  Well, Counsel, you need to put another

6        question before the witness.

7                    MR. DUNN:  Oh.

8        Q.   BY MR. DUNN:  So we're at what day about now?

9        A.   This is October 2nd.

10       Q.   So then what do you do?

11       A.   So we get the -- we get the cattle gathered up and put in

12       the corrals.  There were still a few here and there that we had

13       in neighbors' corrals and things like that.

14                   MR. PASKETT:  Your Honor, I'm going to object to the

15       relevance.  We are still talking about cattle.

16                   THE COURT:  Sustained.

17       Q.   BY MR. DUNN:  So you get the cattle gathered up.  And then

18       what happened?  You move on to do what?

19       A.   I head to the house to start paying some bills that Melinda

20       didn't cover during the week.  It was one of the -- one of the

21       tasks she was kind of --

22                   MR. PASKETT:  Objection, Your Honor.

23                   THE COURT:  Sustained.

24                   MR. PASKETT:  Relevance, 403.

25                   THE COURT:  Sustained.
```

```
 1                   MR. PASKETT:  Move to strike.

 2                   THE COURT:  I will strike the last response.

 3       Q.   BY MR. DUNN:  So you had to do something to move on with

 4       your bill paying?

 5       A.   I had to pick up the slack that hadn't been taken care of

 6       earlier in the week.

 7                   MR. PASKETT:  Objection, Your Honor.  403.

 8                   THE COURT:  Sustained.

 9                   MR. PASKETT:  Move to strike.

10                   THE COURT:  I'll strike the last response.

11                   Mr. Dunn, let's move into a different area, please.

12                   MR. DUNN:  I'm almost there, so anyway...

13                   THE COURT:  Let's be there now.  Go ahead.

14       Q.   BY MR. DUNN:  So you go to the bank at some point; correct?

15       A.   Yes.

16       Q.   And made arrangements to get bills paid, I take it?

17       A.   I went to the bank because the bills I went to pay, there

18       was no funds left in the bank --

19                   MR. PASKETT:  Objection, Your Honor.

20                   THE COURT:  Sustained.  Counsel --

21                   MR. PASKETT:  We have been through this.

22                   THE COURT:  -- I've made it very clear to move off

23       this area right now.  All right?

24                   MR. DUNN:  This is where he gets arrested; that's what

25       I'm leading to.
```

1              THE COURT:  Well, then let's go directly to that,

2     Mr. Dunn.

3              MR. DUNN:  Okay.

4     Q.   BY MR. DUNN:  So then what happens?

5     A.   So I'm at the bank transferring some funds and finding out

6     where the cash went out of that account.

7              MR. PASKETT:  Your Honor, objection.  Move to strike.

8              THE COURT:  Counsel, I'm going to ask you to lead the

9     witness directly.  I've already made very clear my ruling, and I

10    expect you to follow it.

11             MR. DUNN:  Judge, I'm trying to get there.

12             THE COURT:  I understand.  But ask the witness very

13    direct questions, and I'll direct the witness --

14    Q.   BY MR. DUNN:  So you leave the bank; you go outside.  What

15    happens?

16    A.   On my way to the bank, I called Corporal Melanese and told

17    her she was right on the stuff she told me --

18             MR. PASKETT:  Objection.  Your Honor --

19             THE COURT:  Counsel, I'm going to direct the witness.

20             It should be very clear, Mr. Boam, that you are not to

21    discuss the matter that you were just referring to.

22             THE WITNESS:  Okay.

23             THE COURT:  Proceed.

24    Q.   BY MR. DUNN:  So you go outside.  What happens?

25    A.   I was arrested in the Bank of Commerce, and they escorted

1      me outside.

2      Q.   Were you cooperative?

3      A.   Absolutely.

4      Q.   Did they search your vehicle during the arrest?

5      A.   Yes, they did.

6      Q.   What did they take?

7      A.   They took every piece of electronic device and a firearm.

8      Q.   And what happened to you?

9      A.   I was taken to Jefferson County Sheriff's Department.

10     Q.   Now, you've heard the testimony of every electronic device

11     they took.

12          Did that include the XR and the 6?

13     A.   Yes.

14     Q.   Now, on -- how many thumbnails did they take, if you know?

15     A.   Thumb drives?

16     Q.   Mm-hmm.

17     A.   I can't remember off the top of my head.  But between the

18     house, there was a lot.  Because I had them for various things.

19     Like, with my equipment and stuff like that, you got to have

20     them for programming on some of the auto-steer and things like

21     that.

22     Q.   And on any of those thumb drives, was there any photos of

23     Takyra or Ms. Ashbocker that were in any way inappropriate?

24     A.   No.

25          MR. PASKETT:  Objection.  Foundation.

1          THE COURT:  The witness can testify as to what was on

2     the thumb drives in his possession, so I'll overrule the

3     objection.  Proceed.

4          But that's only what the witness is testifying to, and

5     it's limited just to his knowledge.  Go ahead and proceed.

6     Q.   BY MR. DUNN:  Then what happened?

7     A.   I made a phone call from the jail to Robin Dunn.

8          MR. PASKETT:  Object as to hearsay for whatever is

9     next.

10         THE COURT:  Well, I'll overrule the objection.  But I

11    don't know -- it seems to me we are getting into something quite

12    irrelevant and potentially privileged.  So you would proceed at

13    your peril if you get into the communications.  Go ahead.

14    Q.   BY MR. DUNN:  For what reason did you not get ahold of me?

15    A.   I was informed you were out of town.

16         MR. PASKETT:  Objection.  Relevance.

17         THE COURT:  Sustained.

18    Q.   BY MR. DUNN:  In any event, you moved on and found someone

19    to help you out; correct?

20    A.   Correct.

21    Q.   Now, let's go to what I call the "Heise/motel incident."

22         What was the plan on November 1st of 2019?

23         I'm losing my voice again; sorry, Your Honor.

24    A.   The plan was is to -- two families, my family and Matt

25    Thomson's family, were set to go to Heise.  And we called up to

1     Heise first, found out they were closed for maintenance.  So we

2     were looking for options.  We called, like, Apple Athletic,

3     things like that, to see if they had open swim.  And finally

4     resorted to renting a hotel room that would let us use their hot

5     tub and pool if we rented a room.

6     Q.   Who was part of this activity?

7     A.   Who was part of orchestrating it, or who was part of --

8     Q.   What people were involved?

9     A.   What people were involved?  There was my family; me,

10    Melinda, ███████, ███████, ███████, and ███████.  And then Matt

11    and Sarah Thomson and their two children, ███████ and ███████

12    (phonetic).

13    Q.   And what was your purpose in renting the room?

14    A.   To use their facilities, the hot tub and pool.

15    Q.   And did the children and/or adults swim and participate in

16    the --

17    A.   Everybody did.

18    Q.   Then what happened?

19    A.   It got late, and everybody got -- all the kids got tired,

20    and we headed for home.

21    Q.   And do you know approximately what time you headed for

22    home?

23    A.   9:30, 10:00-ish.

24    Q.   And how far is the drive from this motel by the river to

25    your home?

```
 1      A.    About 20 minutes.

 2      Q.    So you get home.  Then what happened?

 3      A.    Get home, help Mindy get the kids ready for bed.  ████

 4      was still in diapers.  We had to get her ready for bed.  We

 5      discovered we had left the diaper bag at the hotel.

 6      Q.    And now what time is it?

 7      A.    10:30.

 8      Q.    Okay.  And what was your next step?

 9      A.    I told her I would go back and get it.  She -- we couldn't

10      recall whether we left it at the pool or in the bedroom.

11      Q.    In the what room?

12      A.    We couldn't recall whether we left it in the pool or the

13      bedroom.

14      Q.    Who is "we"?

15      A.    Melinda and I.

16      Q.    Okay.  Then what happened?

17      A.    So then I volunteered to go back to get it.  ████  is

18      standing right there.  She goes, "I want to go.  I want to go."

19      Mindy says, "Yeah, that's fine.  Take her."

20            I says, "It's just going to be a quick trip."  And so

21      we left.  We went to go back to get it.  Went into the hotel

22      doors and walked over to the big glass door at the pool.  And I

23      could see through the door that there was no diaper bag there.

24      So we went up to the room and, lo and behold, there was the

25      diaper bag.
```

1     Q.   Then what happened?

2     A.   ███████   turned the TV on, started watching "The Princess

3     Diaries."

4     Q.   And what did you do?

5     A.   I said, "No, no.  Let's go."

6          She is like, "No.  Let's just watch this.  We are

7     already here."  I sit down on the bed and start playing that

8     Game of Thrones.

9     Q.   What time did the pool close?

10    A.   The pool closed at 10:00.  That's why I wasn't able to open

11    the door.  I just had to look through the glass.

12    Q.   And would your room key open the pool door?

13    A.   It would during regular business hours, yes.

14    Q.   But not after 10:00 p.m.?

15    A.   No.  No.  That door locks.

16    Q.   So then what happened?  You're up in the motel room.  What

17    happens next?  Are you clothed?

18    A.   Yeah.  We had already went home, already fully clothed.

19    Q.   Then what happened?

20    A.   She is watching the movie.  I'm playing the game.  I fell

21    asleep playing the game, woke up.  She is asleep.  I said,

22    "Okay.  Time to go.  We gotta go."  We got in the pickup and

23    headed for home.

24    Q.   Was there ever any touching of her to your penis?

25    A.   No.

1      Q.   Were you ever in boxer trunks?

2      A.   Under my clothes, yes.

3      Q.   But not openly with your clothes -- with your clothes off?

4      A.   No.

5      Q.   Did you ever appear in the nude at that motel room?

6      A.   No.

7      Q.   Ms. ████████   indicates that she touched your penis; is

8      that correct?

9      A.   She has indicated that.

10     Q.   That's what she said, not what you said; correct?

11     A.   She has indicated that, yes.

12     Q.   And she didn't know if it was erect or not; is that

13     correct?

14     A.   From the interview that I saw, that's correct.

15     Q.   And you're saying that never happened?

16     A.   That never happened.

17     Q.   And why would you not have an erection, if it were true?

18     This is the part I know is embarrassing to you, but go ahead and

19     tell it.

20     A.   I have always had a little bit of problem with erectile

21     dysfunction, and that was part of the problem Melinda and I were

22     having, was that.  And I had to take pills for that issue.

23     Q.   You didn't take any pills that night?

24     A.   No.

25     Q.   And what pills would you take for that?

```
 1      A.    Sildenafil.

 2      Q.    What is that?

 3      A.    Generic Viagra.

 4      Q.    So █████ claims you had been drinking most of the day and

 5      night.

 6            You had been working most of the day, hadn't you?

 7      A.    That's correct.

 8      Q.    Had you consumed any alcoholic beverages up to that point

 9      in time?

10      A.    In the evening?

11      Q.    Mm-hmm.

12      A.    Yes.

13      Q.    How many?

14      A.    I can't recall.

15      Q.    So when you woke up, what time was it?

16      A.    1:30, 2:00 in the morning, somewhere in there.

17      Q.    Now, Ms. █████ indicates that you had given her a

18      sleeping pill called Ambien in the hot tub.

19            You heard that testimony?

20      A.    I did hear that.

21      Q.    Was that even possible?

22      A.    That was not possible.

23      Q.    Why was that?

24      A.    Because the pool was closed.

25            THE COURT:  Counsel, we are going to take another
```

```
 1      break.  Is this a good breaking point?

 2                  MR. DUNN:  It really is for me.

 3                  THE COURT:  Ladies and gentlemen, we will take a very

 4      short, 15-minute recess, because we will recess at 3:00.

 5                  I want to again admonish you not -- to continue

 6      following the Court's instruction concerning juror conduct while

 7      on this recess.  We will be in recess for 15 minutes.

 8            (Recess at 1:24 p.m. until 1:43 p.m.)

 9            (Jury present.)

10                  THE COURT:  For the record, I'll note that the jury is

11      present.

12                  Mr. Boam, I'll remind you you are still under oath.

13                  You may resume your examination, Mr. Dunn.

14      Q.   BY MR. DUNN:  So, Mr. Boam, at the Hilton motel, did

15      anything inappropriate occur between you and Ms. █████████?

16      A.   No.

17      Q.   Now, there is another allegation of an activity with you

18      and Ms. ██████████  at your home.

19                  Do you recall her testifying about that?

20      A.   I recall her testifying about that, yes.

21      Q.   Could you explain in your own words to the jury what you

22      recall.

23      A.   I don't recall anything of the sort.

24      Q.   Did you ever sleep with your wife and ████████  in the same

25      bed in the more adult years?
```

1    A.    Yes.

2    Q.    And how was that situation?  Meaning, how were you placed

3    in bed?

4    A.    It was usually me, Melinda, and ████.

5    Q.    Why would ████ ever come into your master room to sleep

6    with you?

7    A.    She had nightmares from her past experiences with her

8    father and stuff like that, and Mindy let her in there to sleep

9    once in awhile.  And when it would get to be too much, that's

10   where I would go to the couch.

11   Q.    Have you ever touched Ms. ████ on her body in a sexual

12   manner over or under her clothing?

13   A.    Never.

14   Q.    Did you ever stand in front of T.A. in a motel room naked?

15   A.    Never.

16   Q.    Have you ever tried or actually had sexual activity with a

17   prostitute?

18   A.    No.

19   Q.    Have you ever called any sex numbers or sex-oriented

20   businesses for services?

21         MR. PASKETT:  Your Honor, I'm going to object to the

22   relevance of this.

23         THE COURT:  Sustained.  Yeah, I'll sustain the

24   objection.

25         MR. DUNN:  To that question only or --

```
 1                 THE COURT:  Yes.  I sustained the objection.

 2       Q.   BY MR. DUNN:  Have you ever engaged in sexual contact with

 3       anyone through intimidation, threats, or violence?

 4       A.   No.

 5       Q.   Do you know or have any kind of pornography in your

 6       possession, under your control, or hidden anywhere?

 7       A.   No.

 8       Q.   Have you downloaded any pornography or nudity from the

 9       Internet?

10       A.   I have before, yes.

11       Q.   And would that be adult pornography?

12       A.   Correct.

13       Q.   And do you do that currently?

14       A.   No.

15       Q.   Has your penis ever been exposed while in a public place?

16       A.   No.

17                 MR. PASKETT:  Your Honor, I'm going to object to a

18       line of questioning that is not directed towards the facts that

19       have been presented in this case.

20                 THE COURT:  Well, that question might have.  So I can

21       give counsel leeway, but it does need to be tied to something

22       that is relevant to the issues before the jury.

23                 Go ahead and proceed.

24       Q.   BY MR. DUNN:  Have you had sexual contact with anyone under

25       18 years of age as an adult?
```

```
 1      A.   No.

 2      Q.   Have you engaged in any grooming activities with a minor

 3      child for sexual reasons?

 4      A.   No.

 5      Q.   Have you felt sexually aroused by looking at or having

 6      contact with a person under the age of 18?

 7      A.   No.

 8                MR. DUNN:  That's all I have, Your Honor.

 9                THE COURT:  Mr. Paskett, cross.

10                MR. PASKETT:  Yes, Your Honor.

11                MR. DUNN:  Let me just clean up my junk here first.

12                            CROSS-EXAMINATION

13      BY MR. PASKETT:

14      Q.   Mr. Boam, I want to start by talking with you about the

15      camera that Mr. Dunn talked to you about setting up in the

16      master bathroom of your residence.

17                You ordered that camera?

18      A.   Melinda and I decided to order that camera; correct.

19      Q.   Okay.  You placed the order for that camera?

20      A.   Correct.

21      Q.   You said when it arrived, you and Melinda set that up

22      together?

23      A.   Correct.

24      Q.   So you were in the room.  Tell us exactly what you did in

25      that process.
```

```
 1      A.   We were in the living room and the bathroom, sir.

 2      Q.   Okay.  What did you do specifically?  Not just where you

 3      were, but what you did.

 4      A.   I know.  But there were two instances that you spoke of.

 5      Which one are you speaking of?

 6      Q.   Walk us through both of them.

 7      A.   Okay.  The first instance, we were opening the package.

 8      The box was already open, the package it came in.  We opened the

 9      package in the living room.

10      Q.   Let me do a little more -- this is my fault.

11           What specifically did you do?  Not both of you.  What

12      part did you take in setting up that camera?

13      A.   There was both of us there, so --

14      Q.   I understand.  I understand --

15      A.   I guess I don't understand the question.

16      Q.   Okay.  So when you said, "We set up the camera," certainly

17      both of you didn't take your hands at the same time and open the

18      package and both of you touching your hands at the same time

19      plugging in the camera and both of you holding one phone

20      downloading the app together.

21           Do you understand what I mean?

22      A.   Are you insinuating something, or are you just asking me a

23      question?

24      Q.   I'm asking you what you did.

25      A.   Asking me what I did?
```

1    Q.    Yes.  What part in setting up that camera did you do?

2    A.    Opened the box.

3    Q.    Okay.  What did you do next?

4    A.    Plugged the USB camera into the wall in the living room

5    next to the stairs, where we were all sitting.

6    Q.    Okay.  What did you do next?

7    A.    Opened my phone.  It was supposed to automatically connect

8    or something like that.  I couldn't figure it out.  Mindy says,

9    "Here.  Let's try."

10   Q.    Did you download the BV Cam app?

11   A.    I did not.

12   Q.    You did not.  Okay.  Who did that?

13   A.    Melinda.  But it was on my phone.

14   Q.    It was on your phone.

15         Why did Melinda do it but on your phone?

16   A.    I couldn't figure out how to make it work, and I was

17   getting frustrated with it.

18   Q.    Okay.  So, from there, you download the app; and your

19   testimony is Melinda did everything else to set up the camera?

20   A.    No.  She downloaded the app and handed the phone back to

21   me.

22   Q.    What did you do next?

23   A.    Seeing once the app was up, it automatically connected, and

24   you could view the screen.

25   Q.    Okay.

1    A.   Handed it back to her so she could view the screen as well.

2    Q.   When you say you could view the screen, what were you

3    viewing on the screen?

4    A.   What was being shown from the camera.

5    Q.   Okay.  After that point, you said there was another point

6    where -- or another room that you were in and you set it up in

7    the master bathroom.

8    A.   We both stood up.  I pulled the camera out of the wall.

9    She walked with me.  We walked into the bathroom.  I plugged it

10   into the bathroom wall socket.

11        She's looking at the phone.  She was looking at the

12   phone.  It came up.  She handed the phone back to me, seemed to

13   work.  We walked back towards the living room.  By the time we

14   sat down in the living room, the screen was black.

15   Q.   Okay.  So at this point, you have got it set up.  The

16   screen goes black.  Then you do some troubleshooting, or what do

17   you do next?

18   A.   So then we tried to restart the app, just exit out of the

19   app, restarted the app.  Walked back to the bedroom, made sure

20   the thing was plugged in still, didn't fall out of the socket.

21        The screen came on, came live again.  And walked back

22   towards the living room, and the screen dropped out again.

23   That's when we determined that it was a distance thing.

24   Q.   Okay.  The screen dropped out.  It's a distance thing.

25        And just to clarify, when you say the screen dropped

1   out, you are just saying the picture went off when you got a

2   certain distance from the camera?  That's what you're saying?

3   A.   Correct.

4   Q.   And so when that would happen, just the app would shut off

5   or the view of the video would stop showing on the app?

6   A.   The view of the video would stop showing on the app.

7   Q.   Okay.  And so no video was being recorded?

8   A.   No.

9   Q.   And what did you do after that?

10  A.   Went on to playing our Game of Thrones game.

11  Q.   Okay.  And after that, the app is on your phone.  Do you

12  open it up again?

13  A.   I never opened it up again after that.

14  Q.   So your testimony is that you get the camera; you set it up

15  together; you move a certain distance from where the camera is

16  set up; and then it's only on your phone, and you never look at

17  that app again?

18  A.   I don't know that it was only ever on my phone.

19  Q.   Okay.  According to what you do know, it's on your phone?

20  A.   Correct.

21  Q.   And you never look at the app again?

22  A.   Correct.

23  Q.   Okay.  So, really quickly, at the time that you put that in

24  the master bathroom, was the clear shower curtain up in there?

25  A.   I assume so.

1    Q.   And at that time, was ████████ showering in the master

2    bathroom?

3    A.   Not to my knowledge.

4    Q.   Not to your knowledge.

5         To your knowledge, no one showered in the master

6    bathroom at that time other than you and your wife?

7    A.   That's incorrect.  It was just me and my wife, yes.

8    Q.   Okay.  Were you concerned at all about people being filmed

9    nude in there with this camera?

10   A.   It wasn't -- it wasn't operational.

11   Q.   It wasn't operational.

12        You talked with Mr. Dunn on direct examination about

13   the date of September 21st of 2019, when Melinda confronted you

14   about the videos she found on your phone; correct?

15   A.   Correct.

16   Q.   And you said at that time, she confronted you; you didn't

17   know what she was talking about.  And then she said, "Let's just

18   delete the app"; is that correct?

19   A.   No.

20   Q.   She didn't say, "Let's just delete it"?

21   A.   We went to bed first.

22   Q.   Okay.  You went to bed first.

23        When is it that you talk about it again and she says,

24   "Let's just delete it"?

25   A.   The next -- that morning.

1    Q.    Okay.  So same day.  It's still the 21st; it's just you

2    went back to sleep, you woke up, and then you deleted the app

3    off of your phone?

4    A.    We deleted the app off the phone.

5    Q.    The two of you deleted the app off of your phone?

6    A.    Agreed -- agreed to that as parents.

7    Q.    You're sure about that?

8    A.    Yes.

9    Q.    You testified that after that, you went to Mackay that week

10   to cut grain.

11             Did you ask to take ███████ with you?

12   A.    I needed help on Wednesday.  I had -- I had to switch

13   fields, which was across the edge of the valley.  And I needed a

14   grain cart operator bad.

15   Q.    ███████ didn't go with you, did she?

16   A.    No.

17   Q.    Melinda didn't let her?

18   A.    No.

19   Q.    Now, I want to move to the November 1st incident.  You

20   talked about that night on direct examination.  Mr. Dunn asked

21   you if you had been drinking that night.

22             And you said you didn't remember how much you had to

23   drink, but you had been drinking; is that fair?

24   A.    That's correct.

25   Q.    Did you drive that night?

```
 1     A.   I did.

 2     Q.   And you don't know how much you had been drinking?

 3     A.   I had drank earlier.

 4     Q.   Okay.

 5     A.   But I drove at 10:30, 11 o'clock that night.  So it was

 6     quite a few hours after.

 7     Q.   What is your phone number?

 8     A.   What is my phone number?

 9     Q.   Yes.

10     A.   I believe you got it on just about every document you've

11     got.

12     Q.   Okay.  Let me be more direct.  Is your phone number (208)

13     317-7424?

14     A.   Yes, sir.

15     Q.   And your testimony is that that night, you couldn't go

16     swimming because the pool was locked?

17     A.   We swam earlier that night.

18     Q.   You swam earlier that night.

19              When you and ████ went back, you couldn't go

20     swimming because the pool was locked?

21     A.   Correct.

22     Q.   Is it your testimony that you never got back into that

23     pool?

24     A.   Correct.

25     Q.   Are you familiar with ████'s phone number?
```

1      A.   Offhand, no.

2      Q.   (208) 313-7206?

3      A.   That could be.  I honestly don't know.

4      Q.   Would it surprise you to find out that on November 2nd, at

5      12:28 and 37 seconds, you sent a text message to ██████ saying,

6      "Pool close at 10.  Got the maintenance guy to let me in"?

7      A.   Say that again.

8      Q.   Would it surprise you to know that the phone number

9      (208) 317-7424 sent a text message or instant message to

10     ████'s phone number on November 2nd at 12:28 a.m. with the

11     following text:  "Pool close at 10.  Got the maintenance guy to

12     let me in"?

13     A.   I believe that text is inaccurate the way it was texted.

14     Q.   Okay.  Would it surprise you the response from ████'s

15     number at 12:28 was "Seriously," question mark?

16     A.   Yeah.

17     Q.   Would it further surprise you that your phone number

18     responded at 12:29 and 56 seconds:  "Yeah.  Stuck the door open

19     for you shorts and tank.  Come on."

20     A.   I don't understand that text message.

21     Q.   You don't understand?  What don't you understand?

22     A.   It didn't make sense.

23     Q.   Well, I'm not the one who wrote it.  But would it surprise

24     you that the text message was sent from your phone saying,

25     "Yeah.  Stuck the door open for you shorts and tank.  Come on."

1  A.   "For you shorts and tank," that makes no sense to me the

2  way it's texted.

3  Q.   All right.  You have no knowledge of any of those text

4  messages; is that what you're saying?

5  A.   I do not.

6  Q.   You testified that you didn't give ███████ any Ambien.

7       You did have a prescription for Ambien, didn't you?

8  A.   A while before, yes.

9  Q.   In fact, in 2017, you filled several prescriptions for

10 Ambien?

11 A.   Correct.  That's about the time my doctor and I were

12 working on that with my sleep issues.

13 Q.   May 17th of 2017, you had a prescription for 90 pills?

14 A.   Seems correct.

15 Q.   September 17th, you had a prescription of Ambien for

16 90 pills?

17 A.   Seems correct.

18 Q.   And December 21st of 2017, you had a prescription for

19 Ambien of 90 pills?

20 A.   Repeat that day again, please.

21 Q.   December 21st of 2017.

22 A.   Correct.

23 Q.   Did you take any other medication that would be sedating in

24 nature?

25 A.   Later on, I was prescribed Xanax and clonazepam.  We were

BOAM - Cross

 1     working through some anxiety issues.

 2     Q.   What is the effect of Xanax, based on your personal

 3     knowledge?  When you take a Xanax pill, does that have a

 4     sedative effect?

 5     A.   It's supposed to mellow out the anxiety, yes.

 6     Q.   Make you sleepy?

 7     A.   Never made me sleepy, no.

 8     Q.   And did you have a prescription for Xanax in 2018?

 9     A.   Can you repeat that, please.

10     Q.   Did you have a prescription for Xanax in 2018?

11     A.   I don't recall that.

12     Q.   Do you recall when you got a prescription for Xanax?

13     A.   Sometime in 2019, I think.  I don't recall, honestly.

14     Q.   And Xanax, would that be lorazepam?

15     A.   I don't think that's the generic term for Xanax, no.

16     Q.   Clonazepam?

17     A.   What's that?  What was that?

18     Q.   Clonazepam.

19     A.   No.

20     Q.   Alprazolam?

21     A.   I don't recognize the -- I don't recognize the generic

22     names.

23     Q.   Okay.  Did you have those prescriptions?

24     A.   Yes.

25     Q.   All of them?

1    A.    Yes.  We tried a few different ones and a combination of

2    some others.

3    Q.    Mr. Boam, I'm going to go through Government's Exhibit

4    No. 1047.  That's been admitted into evidence.  We'll start with

5    message 29.

6          Again, your phone number is (208) 317-7424?

7    A.    That's correct.

8    Q.    And you sent a message to Melinda Scott at approximately

9    10:47 p.m. regarding prednisone?

10   A.    Yes.

11   Q.    What was that about?

12   A.    Making sure I let ███████ have the right dosage of her own

13   pills.

14   Q.    You had the iPhone 6 at this time?

15   A.    In 2018?

16   Q.    In 2018.

17   A.    I believe so.

18   Q.    So this message would have been sent from your iPhone 6?

19   A.    Correct.

20   Q.    Have you had an opportunity to read through all of the

21   messages in Government's Exhibit 1047?

22   A.    I'm sorry.  Say that again.

23   Q.    Have you had the opportunity -- have you read through all

24   of the messages in Government's Exhibit 1047?

25   A.    No.  Our lawyer was never provided those messages.  He had

1    a chance to review them at the Department of Homeland Security.

2         MR. PASKETT:  Your Honor, I'm going to ask that the

3    witness answer only the question that's been asked.

4         THE COURT:  If you'll listen -- the questions almost

5    invariably could be answered yes or no.  If you'll do so, it

6    will allow us to proceed along.  Mr. Dunn will give you a full

7    chance to explain anything that you want to explain later.  But

8    we can proceed more efficiently if you just answer yes or no.

9         MR. PASKETT:  I'm going to ask that the nonresponsive

10   portion of that answer be stricken.

11        THE COURT:  I will.  The response will be stricken.

12        Put a question before the witness.  But be careful

13   that they are not open-ended, or Mr. Boam is absolutely free to

14   explain as he wishes.  Go ahead.

15   Q.   BY MR. PASKETT:  Mr. Boam, I'm going to give you the

16   opportunity to read all of these messages.  If you had read

17   them, this would have shortened the ordeal, but I want to give

18   you that opportunity.

19        I have a paper copy here, or we can go through them

20   one at a time on the overhead.  Your choice.

21   A.   I can go through the paper copy.

22        MR. PASKETT:  Your Honor, is there --

23        THE COURT:  Can you use the -- what is it -- you want

24   to physically look at it?  Is that what you're --

25        MR. PASKETT:  I would like him to go through and just

 1     view them so that I can question him about them without going

 2     through the entire thing.

 3              THE COURT:  All right.  To make it easier,

 4     Ms. Gearhart, would you mind...

 5              Normally Ms. --

 6     Q.   BY MR. PASKETT:  Just go ahead and look at those.  And when

 7     you're done, you can look up.

 8     A.   Okay.  There are some of these that don't make sense;

 9     you'll have to explain.

10     Q.   Just let me know when you're done reading them.

11     A.   Okay.

12              THE COURT:  Mr. Paskett, I assume you have a copy, so

13     you don't need to have those brought back?

14              MR. PASKETT:  I don't.

15              THE COURT:  You don't have a copy, or you have it --

16              MR. PASKETT:  I don't have a copy in front of me, but

17     I won't need them brought back.  We can go through any question

18     on the overhead.

19              THE COURT:  Counsel, is it necessary for Mr. Boam to

20     read all of the --

21              THE DEFENDANT:  I've got two left.

22              THE COURT:  All right.  Go ahead.

23              THE DEFENDANT:  Okay.

24     Q.   BY MR. PASKETT:  Mr. Boam, are there any messages in that

25     75 -- approximately 75 messages of Government's Exhibit 1047

1    that you did not -- of the outgoing messages, the ones that are

2    marked as from you, that you did not send?

3    A.   Not that I recall.

4    Q.   Okay.  Of the incoming messages, are there any messages

5    there that stand out to you as something that didn't look like

6    it came through to your phone or that you're unaware of?

7    A.   Seeing it within the conversation would be hard without

8    seeing it on the phone.  In this format the way you guys are

9    allowed to look at it, it's a little difficult for me.

10   Q.   Understood.  And I'm just giving you the opportunity to say

11   if one of those does not appear to have been an incoming message

12   to your phone.

13        Is there anything that stands out to you?

14   A.   No.

15   Q.   Do they all appear to have been messages that were sent to

16   your iPhone 6 in -- from June through September of 2018?

17   A.   I didn't check the dates on all of them.  I was just

18   reading the messages kind of as I went, trying to just get a

19   feel for the messages.

20        I didn't know what you wanted me to look at, so I

21   was --

22   Q.   That's okay.

23        Even if you didn't check the messages, do you have any

24   question as to whether or not any of those messages were or were

25   not received on your iPhone 6 or sent from your iPhone 6?

1    A.   I don't -- I don't notice any discrepancy right off.  But

2    without seeing it on my phone, it's hard to tell.

3    Q.   Now, Mr. Boam, you testified today and gave an account of

4    events that you have never told law enforcement before; isn't

5    that correct?

6    A.   That's correct.

7    Q.   And you testified even that you spoke with Corporal

8    Melanese the day you were arrested at the bank; correct?

9    A.   That's correct.

10   Q.   And you didn't provide any of these details that you

11   testified to today at that time, did you?

12   A.   No.

13   Q.   And you haven't subsequently spoken with law enforcement?

14        MR. DUNN:  Your Honor, I'm going to object.  He has

15   exercised certain constitutional rights.

16        THE COURT:  Well, Counsel, I think we should limit

17   ourselves just to cross-examination within the scope of the

18   direct.  You may -- if you have case law to present that

19   would -- I'm concerned about making comments.

20        MR. PASKETT:  I understand the concern, Your Honor.

21   And it's the government's position, without making further

22   comment, that that door has been opened.

23        THE COURT:  Well, certainly, within the area -- I'm

24   more concerned about his comments about not testifying to

25   certain topics as opposed to examining the witness about what

 1      the witness has testified to.

 2              So, certainly, if the door has been opened, you are

 3      free to go through it.

 4              MR. PASKETT:  Your Honor, the comment would be that

 5      this is the first time this story has come about.

 6              THE COURT:  Well, let's -- go ahead and proceed.  I'm

 7      cautioning you.  I'm not sustaining the objection; I'm just

 8      cautioning you.  Go ahead.

 9      Q.   BY MR. PASKETT:  This is the first time you've told this

10      story as it pertains to law enforcement; is that correct?

11      A.   Which part of the story?

12      Q.   Your account of setting up this camera; your account with

13      regard to who ordered the camera, what the circumstances were;

14      your account as to never having looked at the camera or never

15      having looked at the application after apparently initially

16      installing it.

17      A.   Correct.

18              MR. DUNN:  I'll renew my objection.

19              THE COURT:  Overruled.  Go ahead.

20      Q.   BY MR. PASKETT:  Go ahead.

21      A.   Correct.

22      Q.   Now, you're aware that your iPhone XR -- you testified, in

23      fact, that the XR and the 6 were both taken into custody by law

24      enforcement?

25      A.   Yes.

 1       Q.   Were seized from you?

 2       A.   Yes.

 3       Q.   In fact, you have seen those exhibits that were admitted as

 4       Government's Exhibit 1058 and 1059; correct?

 5       A.   Which exhibits?

 6       Q.   The physical phones.

 7       A.   I know.  But what were the numbers?

 8       Q.   1058 and 1059.

 9       A.   I believe -- I believe so.

10       Q.   You saw those in court?

11       A.   I saw them.  I just didn't know the exhibit number for

12       sure.

13       Q.   And those were your iPhones; correct?

14       A.   Correct.

15       Q.   Are you aware that Homeland Security has been actively

16       trying to open and look at that iPhone XR?

17       A.   Through my attorney, yes.

18       Q.   Would you be willing to provide the password and user ID at

19       this time?

20            MR. DUNN:  Your Honor, I'm going to object to that

21       question.  He doesn't have to do anything.

22            MR. PASKETT:  Your Honor, I --

23            THE COURT:  Just a moment, Counsel.

24            Counsel, I think I'm going to have to sustain the

25       objection.  I may -- I'm looking at the clock for a reason.  I

 1          may require some briefing on this.

 2                    This is an area that I'll just admit I don't have a

 3          clear fix.  If you have authority that you want to cite, we can

 4          take a short recess and I can look at it.  But we're getting

 5          into some areas that I would be concerned about that a misstep

 6          on my part may be --

 7                    MR. PASKETT:  Your Honor, if the Court is willing to

 8          recess, the government would be fine with that, and we can

 9          return and address the issue.

10                    THE COURT:  Not on the 20th, but later here today

11          still?

12                    MR. PASKETT:  Yes, Your Honor.

13                    MR. DUNN:  That doesn't give me any time to address

14          the issue.

15                    THE COURT:  All right.  I think what I'll do --

16                    Ladies and gentlemen, as I suggested to you, it's not

17          unusual towards the end of a trial for these kind of things to

18          happen.  There are so many things that I have to take up.  I

19          apologize for not having a quick answer.  I need to confer with

20          counsel and hear argument on this issue.

21                    So I'm going to have Ms. Acheson escort you out.  I

22          think at this point, we may have you taken down to the jury

23          room, but do not get too comfortable.  Hopefully, we will have

24          you back within five minutes or so.

25                    All right.  Ms. Acheson, if you'll escort the jury

1    out.

2        (Jury absent.)

3        THE COURT:  Before I hear argument, I want to make

4    sure I understand.

5        I believe that there is at least an inference from

6    Mr. Boam's testimony that those -- that those images were never

7    on the phone or, if they were on the phone, he never looked at

8    them.

9        And you're suggesting, through this question, that if

10   you can access and open it with a password, that then you can

11   subject it to a forensic analysis.  And I assume you would do so

12   between now and when we would reconvene --

13       MR. PASKETT:  Yes, Your Honor.

14       THE COURT:  -- on the 20th.  Is that what you're

15   suggesting?

16       MR. PASKETT:  That's correct.  There were statements

17   made on direct examination about what was on the phone, what was

18   not on the phone.  The contents of that phone were discussed at

19   length by defense counsel and Mr. Boam.

20       And I think it's at least fair to ask the question, if

21   he is saying nothing is there, whether or not he will provide

22   the password to the government for the government to get into

23   that phone.  If he doesn't want to, he doesn't have to.  He can

24   say he won't.

25       THE COURT:  Mr. Dunn?

1            MR. DUNN:  He has constitutional rights that he

2      doesn't have to assist in incriminating himself one way or the

3      other.

4            THE COURT:  Well, I understand that.  And he can

5      decline to do so.  But the problem here is:  Should the

6      government be allowed to ask him if he is willing to provide

7      that password?

8            MR. DUNN:  I think that's very prejudicial and not

9      probative.  It's irrelevant information.

10           Because they are suggesting to the jury that he is

11     possibly hiding something.  He is under oath.  He has told the

12     truth; at least I believe he is telling the truth.  And I don't

13     think we have to assist them in preparing their case.

14           Plus, this is our case-in-chief.  They have already

15     rested.

16           MR. PASKETT:  Your Honor, may I respond to that?

17           THE COURT:  Yes.

18           MR. PASKETT:  The government is keenly aware of

19     constitutional rights against self-incrimination.  When a

20     defendant takes the stand, he waives rights, such as the right

21     to be asked about is this the first time you have given this

22     account.

23           And when the defendant takes the stand and he makes

24     statements about what evidence would or would not be on the

25     phone in question, I believe that opens the door for the

 1          government to ask the question:  If that is, in fact, the case,

 2          will you provide your password to the phone?

 3                    And if the Court needs briefing on it --

 4                    THE COURT:  Well, I --

 5                    MR. PASKETT:  -- the government is willing to do that.

 6          I don't have that with me at this time.

 7                    THE COURT:  The question has been asked.

 8                    MR. DUNN:  I didn't have time to make my --

 9                    THE COURT:  Well, nor did I.  I mean, obviously --

10                    MR. DUNN:  -- my objection to strike that.  And it's

11          totally unfair to present such a question to the jury suggesting

12          that he is hiding evidence.  I think it's a mistrial, if you

13          want my personal opinion.

14                    THE COURT:  Counsel, let me take a few minutes to mull

15          this over.  I can tell what you my thought process is.  I'm

16          trying to think of a nondigital analog.  In other words, if

17          there were -- if the defendant claimed that something did not

18          exist and yet -- or that certain documents would not disclose

19          certain incriminating information, and if he had access to those

20          incriminating documents, would it be improper for the

21          government, on cross-examination, to ask him to make those

22          documents available to the government for inspection for

23          purposes of cross-examining him on his assertion that they do

24          not exist?

25                    And my instincts tell me that that is appropriate.

 1        And so I'm leaning towards agreeing with the government, but

 2        this is -- but playing around with the Fifth Amendment is

 3        obviously something that is a little unsettling.  I have never

 4        had something like this arise during a trial.

 5                  If Counsel has a case --

 6                  MR. PASKETT:  Your Honor, we would need a moment to --

 7                  THE COURT:  Let's take a -- not more than ten minutes.

 8        I think we will probably recess at 3:00.  The jury indicated

 9        that they could stay later.  I will confirm with them; if they

10        want to stay later, we might do that.

11                  But if they are not going to be deliberating, they may

12        prefer to just recess at 3:00, as we originally planned, since

13        they were only asked if they could stay until 5:00 to

14        deliberate.

15                  So let me take a few minutes and mull this over.  I

16        assume you both have access to perhaps Westlaw or Lexis and

17        could review this to see if there is any clear case law.

18                  With regard to a motion for mistrial, what has been

19        said has been said.  So you're free to make the motion, and I'll

20        make a determination on that.  But I still want to resolve the

21        underlying question of whether the defendant, having taken the

22        witness stand, should be compelled to respond to the question of

23        whether he is willing to turn over a password which would

24        provide the government with access to information which he has

25        claimed, directly or by inference, does not contain any

1        incriminating information.

2                All right.  Let's take a ten-minute recess, and then

3        we will reconvene.

4                Counsel, I apologize.  I need to take my computer with

5        me so I can look at the issue.

6                (Recess at 2:27 p.m. until 2:46 p.m.)

7                (Jury absent.)

8                THE COURT:  Counsel, my quick review has not given me

9        any conclusive answer.  I can tell you my inclination is that

10       the door has been opened; and once the defendant testifies

11       within the scope of the direct examination, he or she is subject

12       to the same rules applicable to any witness, including -- but it

13       has to stay within the scope of the direct examination.

14               I think, clearly, there are issues that have been

15       raised about whether Mr. Boam had the app on his phone, whether

16       he ever viewed it.  And so, from that point of view, a forensic

17       evaluation of the phone may well be an appropriate way to

18       address that.

19               So if this were a civil proceeding, I would be

20       inclined to say yes; and I think once a defendant takes the

21       stand, this essentially becomes the same rules apply.

22               But I've got three externs and three law clerks

23       feverishly researching the issue and may have a conclusive

24       answer for me here momentarily.

25               So I'm going to ask the government to move on and

1      circle back to this.  I may have a fairly quick answer.  I think

2      if we reach -- and I assume the government does have more

3      questions of Mr. Boam -- a few.

4              MR. PASKETT:  Yes.

5              THE COURT:  Is that correct?

6              MR. PASKETT:  Yes.

7              THE COURT:  All right.  Mr. Boam, if you'll retake the

8      witness stand.  I think the jury is waiting outside, and we will

9      have them escorted in.

10             MR. DUNN:  I still need to make the motion to strike

11     the last question, and I have another motion that I've already

12     indicated --

13             THE COURT:  Well, let's hold -- yes, just briefly

14     state your motion.  I think I know what it is.

15             MR. DUNN:  First, I would move to strike their last

16     question because it's a hot poker.  I don't know that you can

17     pull that out.  And because you can't pull that out of the

18     jury's eye, I'm making a motion for a mistrial, because it's a

19     Fifth Amendment right that my client does not have to

20     incriminate himself nor provide evidence.  And as such, they

21     have asked that in front of the jury and made him look like he

22     is trying to withhold evidence.

23             And that would be my motion.

24             THE COURT:  All right.

25             MR. DUNN:  I haven't been able to brief it.

1          THE COURT:  I'll reserve ruling on that until I've had

2     a chance to complete my research on the issue.  So it's under

3     advisement.

4          MR. DUNN:  But I still would like it stricken.

5          THE COURT:  Well, that's part of the same motion.  I'm

6     not going to strike it until I have completed my research on it.

7          MR. DUNN:  Okay.

8          THE COURT:  Let's bring the jury in.  And, Mr.

9     Paskett, you may resume your cross.

10         MR. PASKETT:  Thank you, Your Honor.

11      (Jury present.)

12         THE COURT:  Let me note that the jury is present.

13    Mr. Boam has retaken the witness stand.

14          I'll remind you you are still under oath.

15          You may resume your cross-examination, Mr. Paskett.

16         MR. PASKETT:  Thank you, Your Honor.

17    Q.   BY MR. PASKETT:  Mr. Boam, you indicated on direct

18    examination that one of the reasons that the camera was

19    purchased was because you believed prescription medication was

20    being taken?

21    A.   It was brought up to me by my wife that a prescription

22    medication was being taken.

23    Q.   So it wasn't your belief that --

24    A.   It was missing.  She is the one that suggested it was

25    taken.

```
 1     Q.   And did you have any inclination -- did you have any

 2     personal belief on who took that prescription?

 3     A.   I had no idea who would have took it other than a possible

 4     employee.

 5     Q.   Do you have any idea who that possible employee was?

 6     A.   I do not.

 7          MR. PASKETT:  Nothing further, Your Honor.

 8          THE COURT:  You have no more questions?

 9          MR. PASKETT:  Not at this time.

10          THE COURT:  All right.  Well, then -- I thought I was

11     going to have more time to address the issue.  Apparently --

12     give me just a moment, Counsel.

13          All right.  Well, I don't have the luxury of more

14     time, so I'm going to overrule the objection and allow you to

15     ask that last question that you had asked before we took the

16     recess.

17          It is subject to a motion made by Mr. Dunn which I'll

18     consider.  But at this point, go ahead and I'll allow you to

19     inquire further into that so you don't have to recall the

20     witness and cover it on recross.

21          MR. PASKETT:  Thank you, Your Honor.

22     Q.   BY MR. PASKETT:  Mr. Boam, are you willing to provide your

23     password and Apple ID password for your iPhone XR?

24          MR. DUNN:  Your Honor, I'm going to instruct my client

25     not to answer that question because it violates his Fifth
```

**BOAM - Redirect**

1    Amendment rights.

2              THE COURT:  All right.  We'll leave that at that

3    point, then.  If counsel so instructs his witness, then I won't

4    require an answer.

5              Anything else, Mr. Paskett?

6              MR. PASKETT:  No, Your Honor.

7              THE COURT:  Redirect?  Mr. Dunn, redirect?

8              MR. DUNN:  Thank you, Your Honor.

9                       REDIRECT EXAMINATION

10   BY MR. DUNN:

11   Q.   Mr. Boam, has the government ever requested you to supply

12   information to them as you understand the Fifth Amendment?

13             MR. PASKETT:  Your Honor --

14             THE COURT:  Counsel, just a moment.  I want to see the

15   question.  Mr. Paskett, I just need to see the exact question

16   that was asked.

17             Counsel, that question, you know, in all candor, is

18   unintelligible.  Could you restate the question; and then,

19   Mr. Paskett, restate the objection depending upon how the

20   question is phrased.

21   Q.   BY MR. DUNN:  Has the government, through their attorneys,

22   ever requested that you provide a password to any of the cell

23   phones in question?

24   A.   Yes.

25   Q.   And when was that?

1     A.    Just now.

2     Q.    Prior to that time, has there ever been any request made by

3     the government's attorneys to provide a password?

4     A.    No.

5              MR. DUNN:  That's all I have, Your Honor.

6              THE COURT:  Any recross?

7              MR. DUNN:  Oh.  May I still ask one more question?

8              THE COURT:  You may.  You may.

9     Q.    BY MR. DUNN:  It's been brought up that you instructed

10    Ms. ███████     to use the master bathroom.

11              Did that ever occur?

12    A.    No.

13    Q.    Was there ever any dialogue between you and Melinda Scott

14    concerning Ms. ███████     using the master bathroom?

15    A.    Yes.

16    Q.    Could you tell the jury what that was.

17    A.    Melinda and I got in an argument a time or two about

18    Melinda staying in the bed or Melinda using the -- using the

19    bathroom.

20    Q.    Melinda?

21    A.    Melinda -- excuse me.  ███████  using the bathroom.

22    Q.    And was there any more conversation over that?

23    A.    Not really.  It just kind of ended there.

24    Q.    And you never came to a conclusion, either one of you,

25    whether she could?

**BOAM - Redirect/Recross**

1    A.    Melinda agreed that the -- the kids needed to stay out of

2    our room, that that was our private room.

3              MR. DUNN:  That's all I have.

4              THE COURT:  Anything else?

5              MR. PASKETT:  Briefly.

6                        RECROSS-EXAMINATION

7    BY MR. PASKETT:

8    Q.    Mr. Boam, are you aware of Homeland Security requesting

9    your password and user ID for your Apple account?

10   A.    Am I aware of -- say that again.  I'm sorry.

11   Q.    Special agents with Homeland Security -- specifically,

12   Special Agent Kris Knight -- requesting your password, your

13   phone password and your Apple ID user account?

14   A.    I don't recall that, no.

15             MR. PASKETT:  Nothing further, Your Honor.

16             THE COURT:  All right.  I assume the witness can step

17   down.

18             MR. DUNN:  Yes, Your Honor.

19        (End partial transcript.)

20

21

22

23

24

25

1                        REPORTER'S CERTIFICATE

2

3

4          I, TAMARA I. HOHENLEITNER, CSR, RPR, CRR, certify that

5     the foregoing is a correct transcript of proceedings in the

6     above-entitled matter.

7

8

9

10

11

12

13

14    /s/  Tamara I. Hohenleitner              09/16/2021
      _____        _____
15    TAMARA I. HOHENLEITNER, CSR, RPR, CRR     Date

16

17

18

19

20

21

22

23

24

25